**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| AZER SCIENTIFIC INCORPORATED, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 5:21-cv-02972-JMG |
| | : | |
| QUIDEL CORPORATION, | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

**GALLAGHER, J.**                                                    **December 15, 2021**

When Defendant Quidel Corporation ("Quidel") needed assistance to fill and cap tubes for use in its COVID-19 diagnostic test kits, it turned to Plaintiff Azer Scientific Incorporated ("Azer") for its tube-filling services. The parties allegedly reached a deal, though the terms of that deal are disputed. About three months later, the parties' business relationship fell through. Azer now claims that Quidel committed breach of contract, and it brings several quasi-contract claims in the alternative. Before the Court is Quidel's motion to transfer venue and to dismiss. For the following reasons, the Court dismisses Azer's *quantum meruit* claim but otherwise denies the motion.

## I.    FACTUAL ALLEGATIONS[1]

Quidel is a Delaware corporation that manufactures medical devices. Am. Compl. ¶¶ 2, 7, ECF No. 10. In March 2021, Quidel needed help filling and capping tubes for use in its COVID-19 diagnostic test kits. *Id.* ¶¶ 2, 11. So it reached out to Azer, a Pennsylvania corporation that supplies products for laboratories and offers tube-filling services. *Id.* ¶¶ 2, 6.

---

[1] For purposes of this motion, the Court "accept[s] as true the allegations in the complaint and its attachments, as well as reasonable inferences construed in the light most favorable to the plaintiffs." *U.S. Express Lines Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002) (internal citation omitted).

The businesses first contacted one another on March 2, 2021.  *Id.* ¶ 11.  A representative for Quidel emailed Azer's President, Adam Ardekani, and asked whether Azer could fill one million 2 milliliter tubes per week.  *Id.*  At that time, Azer could only fill 10 milliliter tubes; to fill the requested 2 milliliter tubes, Azer needed new automation machines.  *Id.* ¶¶ 11–12.  Azer agreed to purchase and install that machinery so long as Quidel committed to orders over a twelve-month period.  *Id.* ¶ 14.

Negotiations ensued as the parties exchanged pricing proposals.  *Id.* ¶ 17.  Then, on March 25, 2021, Ardekani emailed Quidel and stated that Azer would fill 2.5 million 2 milliliter tubes per week over a twelve-month period at the parties' agreed-to price.  *Id.* ¶ 18; *see also* Am. Compl. Ex. A, at 2–3, ECF No. 10-1.  The email asked Quidel to "confirm . . . in writing" that Azer was "approved to order the [automation] equipment" and that Azer had Quidel's "commitment."  Am. Compl. Ex. A, at 3; *see also* Am. Compl. ¶ 18.  A representative from Quidel answered as follows: "Please use this note as confirmation that we will be moving forward with the 2.5M/week (10M/month) commitment and to support Azer's order of equipment."  Am. Compl. Ex. A, at 2; *see also* Am. Compl. ¶ 19.

In reliance on these communications, "Azer purchased the automation equipment and then built and dedicated an additional room in its Morgantown, Pennsylvania warehouse, and hired additional staff."  Am. Compl. ¶ 21; *see also* Am. Compl. Ex. B, ECF No. 10-2.  Ardekani informed Quidel that Azer had started "to order all necessary components as well as the automation" equipment.  Am. Compl. Ex. A, at 2; *see also* Am. Compl. ¶ 22.

At the same time, the parties worked to memorialize the terms of their agreement in a formal document.  On March 31, 2021, Quidel forwarded a draft purchase order to Ardekani and asked Azer to "review and provide confirmation" of the document.  Am. Compl. ¶ 23; *see also*

Pl.'s Mem. Ex. B, at 3, ECF No. 13-2.  The draft purchase order included terms and conditions, namely, a forum selection clause that laid venue in California.  *See* Pl.'s Mem. Ex. B, at 2; *see also* Pl.'s Mem. Ex. C, at 6, ECF No. 13-3 ("[A]ny disputes arising under or in connection with the Purchase Order or these terms and conditions shall be litigated in the State of California, County of San Diego.").  The terms and conditions also provided that the purchase order becomes "a binding contract" when "acknowledged by [Azer] in writing or, if earlier, when [Azer] commences performance with respect to the subject matter of the Purchase Order."  Pl.'s Mem. Ex. C, at 5–6.

Azer did not manifest acceptance of the purchase order in writing.  Am. Compl. ¶ 23. Instead, Ardekani emailed Quidel to register Azer's "general concerns with the standard [terms and conditions] written on the Purchase Order."  Pl.'s Mem. Ex. B, at 2; *see also* Am. Compl. ¶ 23 ("Azer never accepted or assented to the terms of the March 31 draft purchase order and, indeed, expressly rejected the draft document."); Ardekani Decl. ¶ 5, ECF No. 13-1 ("Azer did not assent to the purchase order, including its other terms and conditions.").  Quidel's representative responded that the terms and conditions were merely "standard language," and that a forthcoming "Supply Agreement" would govern the parties' relationship. Pl.'s Mem. Ex. B, at 2.  Indeed, "Azer understood that any supply agreement would adopt the essential terms" reflected in the parties' March 25 emails.  Am. Compl. ¶ 26.

The parties never executed a supply agreement.  Am. Compl. ¶¶ 25–29.  On May 20, 2021, Quidel sent a draft supply agreement to Azer.  *Id.* ¶ 27.  However, that document included redline edits from Quidel that struck the twelve-month commitment language.  *Id.*  Azer raised that edit to Quidel's attention, reiterating that the "project was launched on the basis of Quidel's 12-month commitment."  *Id.* ¶ 28.  The next month, on June 21, 2021, Quidel informed Azer that it would not "purchase tubes over the agreed-upon 12-month commitment period."  *Id.* ¶ 29.

Azer now asserts claims against Quidel for: (1) breach of contract; (2) anticipatory breach of contract; (3) promissory estoppel; (4) quantum meruit; (5) unjust enrichment; and (6) declaratory judgment.

## II.   STANDARD

Courts can dismiss a complaint for failure to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6).  To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) ("Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." (internal quotation marks and citations omitted)).

Motions to dismiss are reviewed under a three-step framework.  First, the Court identifies "the elements [the] plaintiff must plead to state a claim."  *Connelly*, 809 F.3d at 787 (internal quotation marks and citation omitted).  Second, the Court identifies "allegations that, because they are no more than conclusions, are not entitled to the assumption of truth."  *Id.* (internal quotation marks and citation omitted).  Third, the Court assumes the veracity of well-pleaded factual allegations and "then determine[s] whether they plausibly give rise to an entitlement to relief."  *Id.* (internal quotation marks and citation omitted).  In performing this analysis, the complaint is construed "in the light most favorable to the plaintiff."  *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (internal quotation marks and citation omitted).

For purposes of a motion to dismiss, the Court ordinarily does not consider materials extraneous to the pleadings.  *Id.* at 82 n.4.  That being said, "a document integral to or explicitly

4

relied upon in the complaint may be considered without converting the motion [to dismiss] into one for summary judgment." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (internal quotation marks and citation omitted); *see also M & M Stone Co. v. Pennsylvania*, 388 F. App'x 156, 162 (3d Cir. 2010) ("[A] court should consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." (internal quotation marks and citation omitted)).

The scope of the Court's review is also broadened when, as here, a party moves to transfer venue because of a forum selection clause. *See, e.g.*, *Universal Atl. Sys., Inc. v. Honeywell Int'l, Inc.*, No. 17-4660, 2018 WL 1757727, at *2 (E.D. Pa. Apr. 12, 2018) ("A court may consider affidavits and other evidence outside the pleadings when adjudicating a motion to transfer under 28 U.S.C. § 1404(a)." (citation omitted)).

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a); *see also Atl. Marine Const. Co., Inc. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 60–61 (2013). "[I]n a case not involving a forum selection clause, a court evaluates a § 1404(a) motion using such factors as the convenience of the parties and the relevant public interests." *Mathias v. Caterpillar, Inc.*, 203 F. Supp. 3d 570, 574 (E.D. Pa. 2016) (citation omitted). "The calculus changes, however, when the parties' contract contains a valid forum-selection clause, which represents the parties' agreement as to the most proper forum." *Atl. Marine*, 571 U.S. at 63 (internal quotation marks and citation omitted). "Because forum selection clauses are bargained for by the parties, a valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases." *Mathias*, 203 F. Supp. 3d at 574 (internal quotation marks and citation omitted).

### III.   DISCUSSION

Not only is there a dispute as to whether Azer and Quidel entered a contract, but the parties also dispute the terms of any such contract.  As Azer sees it, the parties entered a contract by way of their March 25 emails.  Pl.'s Mem. 10, ECF No. 13; *see also* Am. Compl. ¶ 31.  Through those emails, Azer alleges, the parties reached a meeting of the minds: Azer would fill tubes for Quidel's test kits over a twelve-month period.  *See* Pl.'s Mem. 2; *see also* Am. Compl. ¶¶ 18–20.  Absent from that agreement was any forum selection clause.

In Quidel's estimation, the March 25 emails do not support the existence of a contract; at most, they reflect an unenforceable "agreement to agree."  Def.'s Mem. 2, ECF No. 12-2.  If the parties entered a contract, the argument goes, they did so when Quidel sent its March 31 purchase order, an offer that Azer accepted by performance.  Def.'s Mem. 9.  Azer responds that it rejected the purchase order, and, by extension, any forum selection clause contained therein.  Pl.'s Mem. 5–8.  Any performance that Azer rendered after March 31, it is averred, "was in furtherance of and pursuant to the March 25 agreement."  Pl.'s Mem. 8 n.35; *see also* Am. Compl. ¶ 23 ("Azer never accepted or assented to the terms of the March 31 draft purchase order . . . .").

The Court first turns its attention to the March 31 purchase order.  If that document is indeed the parties' contract, then its forum selection clause justifies a transfer of this action to the Southern District of California.  *See* Def.'s Mem. 9.  To be sure, "a valid forum-selection clause should be given controlling weight in all but the most exceptional cases."  *Kingsbury, Inc. v. GE Power Conversion UK, Ltd.*, 78 F. Supp. 3d 611, 617–18 (E.D. Pa. 2014) (quoting *Atl. Marine*, 571 U.S. at 63)).

Quidel characterizes Azer's performance *after* March 31 as an "acceptance" of the purchase order.  Def.'s Mem. 5.  But the conduct that Quidel points to—Azer's purchasing of

automation equipment and accompanying components, and its hiring of additional staff to operate that machinery—is alleged to have occurred *before* March 31, in reliance on the parties' purported March 25 email contract. *See* Am. Compl. ¶¶ 21–22; *see also* Pl.'s Mem. 8 ("[T]he supposed 'manifested acceptance' Quidel cites actually occurred *before* Azer even received the draft purchase order." (emphasis in original)). What's more, Azer alleges that it "expressly rejected" the purchase order when it made Quidel aware of "general concerns" with the document. Am. Compl. ¶ 23; *see also* Pl.'s Mem. 3; Pl.'s Mem. Ex. B, at 2; Ardekani Decl. ¶ 5.

"At this stage of the litigation, the Court will not entertain the forum selection clause because the intent of the parties is unclear." *All in One Networking, Inc. v. Fla. House Experience Mgmt. Corp.*, No. 18-2796, 2019 WL 481172, at *3 (E.D. Pa. Feb. 7, 2019). In other words, the Court cannot yet conclude, as a matter of law, that the parties mutually assented to the purchase order and its terms and conditions. *Cf. PPG Indus. Inc. v. Shell Chem. LP*, No. 09-0785, 2010 WL 331863, at *4 (W.D. Pa. Jan. 28, 2010) ("[D]ismissal for improper forum based on a disputed forum selection clause . . . would be inappropriate."); *Stella Labs, LLC v. CPMC, LLC*, No. 08-322, 2008 WL 11383790, at *2 (D.N.J. Apr. 23, 2008) (refusing, at the pleadings stage, to "reach the merits of a disputed term of a disputed contract"); *Reinke Mfg. Co. v. Barksdale, Inc.*, No. 4:15-cv-3072, 2015 WL 8665331, at *3 (D. Neb. Dec. 11, 2015) (declining to enforce a forum selection clause where the "parties have conflicting positions on the contract formation, and the controlling terms and conditions").

The Court now focuses on the March 25 emails. Azer has plausibly alleged that those emails created a contract between the parties.[2] "It is by now hornbook law that the test for

---

[2]    The parties take different positions on the law that governs this contract formation analysis. Azer cites Pennsylvania law; Quidel relies on California law. *Compare* Pl.'s Mem. 9, *with* Def.'s Mem. 9 n.4.

enforceability of an agreement is whether both parties have manifested an intention to be bound."

*ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 665 (3d Cir. 1998) (internal quotation

marks and citation omitted); *see K7 Design Grp., Inc. v. Five Below, Inc.*, --- F. Supp. 3d ----, 2021

WL 2036567, at *2 (E.D. Pa. May 21, 2021); *Reilly Foam Corp. v. Rubbermaid Corp.*, 206 F.

Supp. 2d 643, 650 (E.D. Pa. 2002).  Per Quidel, the parties' email exchange shows only "ongoing,

unsettled negotiation."  Def.'s Mem. 6.  But Azer's well-pled allegations suggest something more

than preliminary negotiation or an unenforceable "agreement to agree."  The emails themselves

sketch out the material terms of the parties' agreement: over a twelve-month period, Azer would

supply Quidel with "2.5M filled tubes per week" at the quoted price.  *See* Am. Compl. Ex. A, at

2–3.  *Compare Lombardo v. Gasparini Excavating Co.*, 123 A.2d 663, 666 (Pa. 1956) (finding

that an alleged contract failed for indefiniteness where "there was no agreement or even discussion

as to any of the essential terms of the alleged bargain such as time or manner of performance, price

to be paid, or the like").  In lieu of a "mere statement of an aspirational goal to reach some future

agreement," *Reynolds Packaging KAMA, Inc. v. Incline Plastics Corp.*, No. 3:08-CV-1902, 2011

WL 5089500, at *8 (M.D. Pa. Oct. 25, 2011) (citation omitted), both parties expressly reference

---

"[B]efore a choice of law question arises, there must actually be a conflict between the potentially applicable bodies of law." *Kerrigan v. Otsuka Am. Pharm., Inc.*, 560 F. App'x 162, 167 (3d Cir. 2014) (internal quotation marks and citation omitted).  "Where there is no conflict, the court should avoid the choice of law question." *Id.* (internal quotation marks and citation omitted).

Here, the Court finds no conflict between Pennsylvania and California law regarding contract formation. *See Hrapczynski v. Bristlecone, Inc.*, No. 20-cv-06014, 2021 WL 3209852, at *4 (E.D. Pa. July 29, 2021).  *Compare ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 665–66 (3d Cir. 1998), *with Schwarzkopf v. Int'l Bus. Machs., Inc.*, No. 08-2715, 2010 WL 1929625, at *5 (N.D. Cal. May 12, 2010).  "Accordingly, we need not resolve the conflict-of-law issue." *Kerrigan*, 560 F. App'x at 167.

For much the same reason, the Court need not decide whether the Uniform Commercial Code ("U.C.C.") applies.  First, Pennsylvania and California have adopted the same U.C.C. provisions that govern contract formation. *Compare* 13 PA. STAT. AND CONS. STAT. ANN. § 2204, *with* CAL. COM. CODE § 2204.  And, at least as it pertains to the contract formation principles at issue here, there is no conflict between the U.C.C. or the common law: both bodies of law, whether in Pennsylvania or in California, require a mutual manifestation of intent to be bound.  Thus, the Court postpones any determination concerning the applicability of the U.C.C. until "the parties have engaged in discovery and are better equipped to provide the Court with a fully developed record." *Cf. Gallo v. PHH Mortg. Corp.*, 916 F. Supp. 2d 537, 555 (D.N.J. 2012).

their "commitment" to one another.  *See* Am. Compl. Ex. A, at 2–3.  And Azer's allegations are not undermined by the parties' subsequent efforts to execute a supply agreement.  "[P]arties may bind themselves contractually although they intend, at some later date, to draft a more formal document."  *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 582 (3d Cir. 2009) (internal quotation marks and citation omitted).  "[M]utual manifestations of assent," of the sort presented here, "that are in themselves sufficient to make a contract will not be prevented from so operating by the mere fact that the parties also manifest an intention to prepare and adopt a written memorial thereof."  *Id.* (internal quotation marks and citation omitted).

In sum, Azer has plausibly alleged that the March 25 emails created a contract with Quidel. Azer has also plausibly alleged that Quidel breached that contract by declining to purchase tubes over the agreed-upon twelve-month term.  *See* Am. Compl. ¶¶ 28–33.  Finally, Azer has plausibly alleged that it suffered damages because of that breach.  *Id.* ¶ 34.  Azer has stated a cognizable breach of contract claim.  *See Cosby v. Am. Media, Inc.*, 197 F. Supp. 3d 735, 739 (E.D. Pa. 2016) ("To state a breach of contract claim under Pennsylvania law, a plaintiff must plead (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." (internal quotation marks and citation omitted)).

The Court next considers the fate of Plaintiff's quasi-contract claims.  Quidel first argues that the existence of a valid and enforceable contract precludes Azer from raising any quasi-contract claims.  *See* Def.'s Mem. 14.  Azer agrees that its quasi-contract claims "would later fall if it ultimately prevailed on its breach of contract count," but it maintains that it is exercising its right to plead in the alternative.  Pl.'s Mem. 17.

"A plaintiff is permitted to plead alternative theories of recovery on breach of contract and unjust enrichment in cases where there is a question as to the validity of the contract in question."

*Premier Payments Online, Inc. v. Payment Sys. Worldwide*, 848 F. Supp. 2d 513, 527 (E.D. Pa. 2012) (internal quotation marks and citation omitted).  Here, the parties dispute the existence of a contract altogether, so Azer is within its right to plead alternative quasi-contract claims.  *Compare id.* ("Where the existence of a contract is uncertain, pleading in the alternative is permitted, even though a plaintiff cannot recover under both theories." (citation omitted)), *and Surety Adm'rs, Inc. v. Pacho's Bail Bonds*, No. 05-CV-5851, 2007 WL 1002136, at *4 (E.D. Pa. Mar. 30, 2007) (permitting plaintiff to allege breach of contract and unjust enrichment claims where defendant "dispute[d] the existence of a contract"), *with AmerisourceBergen Drug Corp. v. Allscripts Healthcare, LLC*, No. 10-6087, 2011 WL 3241356, at *3 (E.D. Pa. July 29, 2011) (dismissing unjust enrichment claim where "neither party contests the validity of the [contract]"), *and Cardiology Care for Child. Inc. v. Ravi*, No. 5:17-cv-04743, 2018 WL 1870717, at *5 (E.D. Pa. Apr. 18, 2018) (dismissing promissory estoppel claim where "[t]here is no dispute . . . that [the parties] entered into an enforceable . . . contract").

With that guidance in mind, Azer's promissory estoppel and unjust enrichment claims may proceed.[3]  Azer's *quantum meruit* claim, however, is entirely duplicative of its claim for unjust

---

[3]     "To maintain a claim for promissory estoppel, a plaintiff must plead facts to show that 1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise." *Woods v. ERA Med LLC*, No. 08-02495, 2009 WL 141854, at *5 (E.D. Pa. Jan. 21, 2009) (internal quotation marks and citation omitted).  Quidel challenges the first element, *see* Def.'s Mem. 16–17, but Azer has raised sufficient factual allegations from which the Court may infer an express promise made to it by Quidel.  Indeed, Azer plausibly alleges that "Quidel made a promise to Azer in the form of a written confirmation that Quidel would order a certain amount of product from Azer over a 12-month commitment period." Am. Compl. ¶ 41. Whether Azer's "reliance on the parties' email exchange . . . was reasonable is a question of fact for the jury." *K7 Design*, 2021 WL 2036567, at *3; *see also Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 208 (Pa. 2007) ("[J]ustifiable reliance is typically a question of fact for the fact-finder to decide, and requires a consideration of the parties, their relationship, and the circumstances surrounding their transaction.").

"The elements of unjust enrichment are: (1) benefits conferred on the defendant by the plaintiff; (2) appreciation of such benefits by the defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for the defendant to retain the benefit without payment of value." *Car Sense, Inc. v. Am. Special Risk, LLC*, 56 F. Supp. 3d 686, 698 (E.D. Pa. 2014) (citation omitted).  Quidel argues that Azer did not confer any benefits upon it, *see* Def.'s Mem. 16, but Azer has plausibly alleged that it produced reagent solution and provided filling and capping services for Quidel.  *See* Am. Compl. ¶¶ 49–52.

enrichment and must be dismissed on that basis.  *See, e.g.*, *MMC 20/20 Inc. v. Cap. Blue Cross*, No. 18-3592, 2019 WL 111038, at *5 (E.D. Pa. Jan. 4, 2019) (dismissing *quantum meruit* claim as duplicative of claim for unjust enrichment); *Power Restoration Int'l, Inc. v. Pepsico, Inc.*, No. 12-1922, 2013 WL 5636618, at *6 (E.D. Pa. Oct. 11, 2013) (same).

## IV.    CONCLUSION

For the foregoing reasons, Azer's *quantum meruit* claim is dismissed, but the remainder of Quidel's motion is denied.  An appropriate order follows.

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge