# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AZER SCIENTIFIC INCORPORATED,<br>  Plaintiff,<br><br>    v.<br><br>QUIDEL CORPORATION,<br>  Defendant. | :<br>:<br>:<br>:  Civil No. 5:21-cv-02972-JMG<br>:<br>:<br>: |

## MEMORANDUM OPINION

**GALLAGHER, J.**                                                                                       December 5, 2022

      Plaintiff Azer Scientific Incorporated alleges Defendant Quidel Corporation breached a contractual agreement the Parties formed over email. The alleged contract provided Azer would produce certain materials for Quidel's COVID-19 test kits over a period of twelve months. Quidel contends the Parties never formed an enforceable contract. Before the Court is Quidel's partial motion for summary judgment as to Azer's claims of (1) breach of contract, (2) anticipatory breach of contract, (3) unjust enrichment, and (4) declaratory judgment. Azer moved for partial summary judgment on the first two elements of its breach of contract claim—specifically, whether a binding contract existed and Quidel breached that contract—and related declaratory judgment claim. For the following reasons, Quidel's motion for summary judgment will be denied in part and granted in part, and Azer's motion for summary judgment will be denied in part and granted in part.

I.  **FACTUAL BACKGROUND**

   a. **Initial Negotiations**

Plaintiff Azer manufactures and supplies products for laboratories, including manual and automated tube-filling services. Am. Compl., ECF No. 10 ¶2. Defendant Quidel develops and manufactures diagnostic healthcare products. Def. Partial Summ. J., ECF No. 47-1 ¶1. In March 2021, the Parties began exploring a business relationship in which Azer would source certain materials for Quidel's COVID-19 test kits. Joint Appendix, ECF No. 48-6 at JA1010, K.S. Richardson Dep. Tr. 24:3-19. On March 2, 2021, Ms. Kyra Bader, a Project Manager at Quidel, emailed Mr. Adam Ardekani, President of Azer, stating Quidel had a need for filling two mL tubes. Joint Appendix, ECF No. 48-4 at JA111. Ms. Bader and Mr. Ardekani then emailed back-and-forth working out initial manufacturing issues. *See id.* at JA107-11.

On March 4, 2021, Mr. Ardekani emailed Ms. Bader, among other information, that Azer could procure machines to "enable [Azer] to fill and cap over one (1) million 2mL tubes per week." *Id.* at JA107. In the same e-mail, Mr. Ardekani provided "[Azer] would ask Quidel to commit to a minimum order of 12 months usage for 48 million prefilled tubes," while also describing Azer's vial and tube filling process. *Id.* Ms. Bader then added Mr. Hiva Ardalan, Quidel's Senior Manager of Global Strategic Sourcing, to her and Mr. Ardekani's email chain exploring the business transaction and relationship. *Id.* at JA106-07.

On March 9, 2021, Mr. Ardekani again emailed Ms. Bader and Mr. Ardalan.[1] His email provided a "pricing proposal" based on the length of the commitment: either twelve months or a

---

[1] *Id.* at JA105. Four other individuals, three with email addresses associated with Azer and one with an email address associate with Quidel, were also "CC'd" on the email. *Id.*

2

range from eighteen to twenty-four months.[2]  Mr. Ardekani also stated, "As soon as we have Quidel's commitment, we are going to move forward with the automation [equipment] with expectations it will arrive within 7-8 weeks." *Id.* at JA105.  Mr. Ardekani, Mr. Ardalan, and Kyra Bader then set up a phone call with the intention of "understanding [Azer] and its capabilities." *Id.* at JA104.

On March 15, 2021, Mr. Ardekani sent Ms. Bader and Mr. Ardalan an updated and more detailed pricing proposal with time commitments ranging from 12-24 months and volumes ranging from one to ten million tube and caps produced each week.  *Id.* at JA102.

Around 9:00 a.m. on the morning of March 17, 2021, Ms. Bader sent an update on the companies' negotiations to Mr. Ardekani, Mr. Ardalan, and eight other individuals representing both companies.[3]  She provided, among other information, "Quidel will be moving forward immediately with ordering at the 3M/week for 12 months tier."[4]  A few minutes later, Mr. Ardekani emailed Ms. Bader stating Quidel should order the product for "52 weeks @ 3M per week = 156,000,000 tubes."  *Id.* at  JA149.   Mr. Ardekani also asked Ms. Bader to "submit [a] [Purchase Order "PO"] . . . by the end of the day so we can move forward ordering the equipment before tomorrow." *Id.*  Ms. Bader responded she would need direct approval from Quidel's Chief

---

[2] *Id.*  Mr. Ardekani's email provides a pricing proposal of "12 month Commitment of 48mm pcs -- $0.0854/pcs" and "18-24 month Commitment of 96 mm pcs."  *Id.*

[3] *Id.* at JA136.  The Court notes the Parties provided emails showing both Eastern and Pacific Standard Times.

[4]  *Id.*  In the same email, Ms. Bader also directed "Hiva [Ardalan] to initiate supply agreement." *Id.*  Ms. Bader attached a document with "the specifications for all of the components of the solution" to the email.  *Id.*

Financial Officer based on the order's dollar amount.[5]  Ms. Bader then emailed Mr. Kevin Richardson, Quidel's Vice President of Advanced Operations, about the potential Azer commitment.[6]

A few days later, Ms. Bader circulated another update following a call between the Parties. *Id.* at JA154.  She provided "Quidel will be moving forward immediately with ordering at the 3M/week for 12 months tier—Hiva/Kyra to have discussion with executive team to get approval on Purchase Order."[7]  She also stated she would "set up [a] Quidel internal meeting to discuss overall filling of the project." ECF No. 48-4 at JA154.  Furthermore, she directed "Hiva to initiate [a] supply agreement." *Id.*

On March 23, 2021, Ms. Bader sent an email to Mr. Ardalan and Kyle Anderson, a Quidel employee, to ask about the status of Quidel's commitment to Azer. *Id.* at JA153-54.  Mr. Ardalan directed Quidel should receive Azer's feedback on sample tubes provided by Quidel, and then they should have an internal call with Mr. Richardson. *Id.* at JA153.  Mr. Ardalan also stated Quidel "need[ed] to consider a Supply Agreement or Services [A]greement." *Id.*  Ms. Bader responded Quidel did not need to wait for feedback on samples. *Id.*  She also provided, "I just had a call with

---

[5] *Id.* Mr. Ardekani responded acknowledging Ms. Bader's need for approval. *Id.* at JA531.  In the meantime, Ms. Bader provided Quidel would "ship [Azer] the necessary samples and start some of the initial documentation exchanges to get the process going." *Id.*

[6] *Id.* at JA150.  Ms. Bader's email included Mr. Ardekani's March 15th pricing proposal. *Id.*  Ms. Bader provided the following message: "I would like to discuss making an immediate commitment to Azer for 3M fills/week for 12 months . . . . Azer is asking for a PO to allow them to purchase the necessary equipment to meet this volume.  I'd like to make sure we are all on the same page before making this commitment." *Id.*  Ms. Bader requested a meeting with Mr. Richardson, Mr. Ardalan, and Mr. Jerry Foster. *Id.*

[7] *Id.*  Ms. Bader later testified the executive team was composed of Mr. Richardson and Randy Steward, Quidel's CFO at the time.  ECF No. 48-6 at JA929, K. Bader Dep. Tr. 48: 2-48:6; *see also id.* at JA907, K. Bader Dep. Tr. 18:3-18:14.

4

Kevin [Richardson] and he would like us to get Azer started 3M/week. We had discussed putting the Supply Agreement together on our last call with Azer." *Id.* Mr. Ardalan replied directing Ms. Bader to ask Azer for a formal quote. *See id.* at JA152.

On the same day, Ms. Bader sent an email to Mr. Ardalan, Mr. Ardekani, and eight other employees of either Azer or Quidel, providing: "We are preparing to create the PO for the 3M/week level for 12 months. Adam – can you please provide a formal quote when possible?" *Id.* at JA157. Mr. Ardekani then sent an email to the group "[a]ttach[ing] [a] formal quote for Quidel based on your 12 month commitment." *Id.* at JA161. The quote noted a "12 Month commitment" totaling $12,604,800.00. *Id.* at JA165. Ms. Bader replied and asked for a separate proposal for filling the solution and noted, "this will allow us to submit the request for a PO of this size." *Id.* at JA161. Mr. Ardalan, Mr. Ardekani, and Ms. Bader emailed back-and-forth clarifying the exact pricing based on a commitment of 52 weeks and three million vials per week. *Id.* at JA160, JA167.

On March 24, 2021, Mr. Ardekani attached a quote from Azer with the additional solution cost information. *Id.* at JA167. The quote provided the same $12,604,800.00 amount of the vials, along with a cost of $1,119,300.00 for the solution service. *Id.* at JA172. The solution service also included a note of "12 Month commitment. 156,000,000 vials." *Id.* Azer provided an updated total of $13,724,100.00. *Id.*

    b. **The Alleged Contract at Issue**

On the morning of March 25, 2021, Mr. Ardekani sent an email to Ms. Bader and Mr. Ardalan providing an "updated quote for 2.5M filled tubes per week." *Id.* at JA176-77 (e-mail and attached quote showing 12-month duration, product and service description, and pricing). Mr. Ardekani also wrote: "Please confirm to me in writing that we are approved to order the equipment

5

and that we have your commitment. I look forward to receiving the purchase order next Monday." *Id.* at JA181-82. In the afternoon, Ms. Bader sent an email update to numerous Quidel and Azer employees, including Mr. Ardekani, following a meeting. *Id.* at JA174. Ms. Bader listed among her "action items: 1. Adam to send updated quote to reflect volume of 10M fills/month for 1 year (120M fills total) a. Kyra to send written approval to place orders for equipment today (3/25). " *Id.* Ms. Bader then responded to Mr. Ardekani's email asking for a written commitment. *Id.* at JA181. Ms. Bader provided "Please use this note as confirmation that we will be moving forward with the 2.5M/week (10M/month) commitment and to support Azer's order of equipment. We are working on the PO now."[8]

Following the commitment, Ms. Bader emailed Mr. Ardekani (CC'ing Mr. Ardalan and additional Azer employees) inquiring whether they could update the quote for 120 million units instead of the 130 million units that were included in Mr. Ardekani's latest quote.[9] Mr. Ardekani clarified "2.5M per week over 52 weeks is 130M" so asked if they should "keep or change[.]" ECF No. 48-1 at JA180. Ms. Bader responded, "Let's please update to 10M/month for 12 months = 120M . . . this is our current guaranteed tube and cap supply." *Id.* at JA179-80. Mr. Ardekani provided an updated quote based on a quantity of 10 million per month for 12 months, or

---

[8] *Id.* Mr. Ardekani later testified he believed the commitment was a contract at the time of receiving Ms. Bader's email response. ECF No. 48-6 at JA833, A. Ardekani Dep. Tr. 24:9-24:18 ("I said I needed a commitment which I believe is a contract."). On the other hand, Ms. Bader later testified her written confirmation "was to confirm the volume and moving forward with the process of ordering the equipment and the qualification of Azer." *Id.* at JA956, K. Bader Dep. Tr. 92:12-92:21. Ms. Bader also acknowledged that "as a result of this email, Azer relied on Quidel's commitment for a volume of 2.5 million per week, 10 million per month" *Id.* at JA957, K. Bader Dep. Tr. 93:15-93:21.

[9] ECF No. 48-1 at JA180. Ms. Bader also asked if they could include a description "that the unit of measure is cases of 5,000 fills." *Id.*

120,000,000 vials, stating, "No problem, see attached." *Id.* at JA179. Ms. Bader thanked him for the "quick turnaround." *Id.*

### c. Subsequent Negotiations and Other Discussion

Following the March 25, 2021 email exchange, Ms. Bader sent emails to other Quidel employees, Mr. Gaston Garcia and Mr. Randy Steward, identifying Azer as "a new formulation and filling vendor." *Id.* at JA186-87. She also provided:

> We would like to make a 12 month commitment to Azer (which is their minimum commitment period) at 10M fills/month. Hiva is working on the supply agreement, but in the meantime, I will be routing the purchase request via DocuSign shortly. Please review and let me know if you have any questions. Otherwise, please sign so that I can get the PO over to Azer.

*Id.* at JA187. The Quidel employees then sent emails back-and-forth comparing Azer's capabilities and prices with a previous manufacture. *Id.* at 184-87. Azer signed and completed a purchase request form for a quantity of 120,000,000 vials on March 29, 2021. *Id.* at JA188.

On April 1, 2021, Mr. Kyle Anderson, an employee with Quidel, sent Mr. Ardekani a purchase order to review. *Id.* at JA197. Mr. Ardekani responded to Mr. Anderson, CC'ing other Quidel and Azer employees, with some feedback to discuss before signing the purchase order. *Id.* Mr. Ardekani expressed "general concerns with the standard [terms and conditions] on the Purchase Order." *Id.* Mr. Ardekani also described his understanding of the "time-sensitive project for Quidel." *Id.* at JA197. But "want[ed] to be sure the agreement is written exactly how [they] discussed." *Id.* Ms. Bader responded, "the Supply Agreement will be the governing agreement" and addressed Mr. Ardekani's feedback. *Id.* The Parties thus intended to execute a draft supply agreement to detail the terms and conditions of the agreement. *Id.* at JA200-13. After sending an initial draft to Mr. Ardekani, Mr. Ardalan stated he felt "certain that [they] c[ould] finalize it." *Id.* at JA216. But, in the meantime, the Parties should "move forward with the project as quickly as

7

possible." *Id.* Mr. Ardalan and Mr. Ardekani continued to exchange emails on costs and sourcing of the tubes and caps. *Id.* at JA215.

Throughout April and May, Mr. Ardekani sent numerous emails to Ms. Bader and other Quidel employees to update on the status of the agreement, such as to show Ms. Bader the room Azer constructed to manufacture the product, *Id.* at JA223, and to update on the status of automation and shipping, *Id.* at. JA226, JA229. Ms. Bader often responded encouragingly. *See id.* at JA229. The Parties also exchanged various redlined drafts of the Supply Agreement. *See id.* at JA220-22, JA252-53. In response to a Supply Agreement draft provided to Mr. Ardekani from Ms. Bader on May 20, 2021, Mr. Ardekani had one main critique: Quidel's removal of the twelve-month time commitment. *Id.* at JA249. Mr. Ardekani provided:

> Something I noticed was that Quidel removed the 12-month commitment that we agreed-upon. This project was launched on the basis of Quidel's 12-month commitment, which is reflected from Pricing to our Investment in equipment to help serve your needs long-term.
>
> I'm hoping to use this call to settle on the main sections and make sure we're still on track to complete the Supply Agreement before Azer begins production.

*Id.* The employees discussed the Supply Agreement over email and a conference call. *Id.* at JA243-47. Employees from both Parties continued to discuss the agreement through mid-June. *Id.* at JA234-41.

On June 16, 2021, Mr. Ardalan emailed Mr. Richardson an updated "Supply Agreement is ready to be sent out to [Azer] for signature." Joint Appendix, ECF No. 48-5 at JA358. Mr. Ardalan further provided:

> . . . [I]n a meeting with Gaston and Jerry, I heard that the sales forecast for the QV At Home [COVID-19 tests] has been reduced significantly and that we need to reduce our demand with Azer and others as well. Give[sic] this, it is better not to send them the Agreement otherwise we will be locked to pay them 30% of anything

that we don't take.  Right now, the Terms and Conditions of the PO are in our favor.  We will further discuss this during our meeting on Friday.

*Id.*  Mr. Richardson replied, "I agree, lets old[sic] off on sending Azer the agreement.  Great catch . . . ."  *Id.*  The next day, Mr. Richardson emailed Mr. Ardalan and Ms. Bader following "a discussion regarding ramp down for COVID products with respect to Azer."  *Id.* at JA360.  He stated the need "to communicate the ramp down with each supplier."  *Id.*  Mr. Richardson further expressed he "expect[ed] some push back from both [suppliers]."  *Id*

On June 21, 2021, Mr. Ardekani emailed Mr. Ardalan inquiring into a final, completed Supply Agreement.  ECF No. 48-4 at JA234-35.  He provided, "As soon as we get the approval on the batch for filing, sign the contract, and I get the purchase order, we are good to go!"  *Id.* at JA235.

But the Parties never executed a final Supply Agreement.  Azer claims Mr. Ardalan advised that Quidel would not fulfill the 120 million tubes within the twelve-month commitment period.  Pl.'s Statement of Undisputed Material Facts, ECF No. 48-2 ¶96 (citing ECF No. 48-6 at JA1157, H. Ardalan Dep. Tr. 201:12-22).  Quidel submits it never communicated it would not purchase the 120 million tubes, as agreed to in the March 25, 2021 emails.  Def.'s Statement of Disputed Material Facts, ECF No. 51-1 at 35.  The Parties continued to negotiate the terms and conditions of the Supply Agreement throughout June.[10]  *See generally* ECF No. 48-6 at JA775-781; *see also* ECF No. 48-4 at JA234-35. *see id.* at JA817 (Ardalan emailed Ardekani stating Quidel was reviewing the proposals and hoped to get back to him by June 25, 2021), JA821 (Ardekani emailed Ardalan asking for a call on July 6, 2021).  And Azer never filled nor shipped Quidel filled tubes

---

[10] *See e.g.*, ECF No. 48-6 at JA775-781 (discussing edits to the Supply Agreement in mid-June); ECF No. 48-4 at JA234-36 (same); ECF 48-6 at JA817 (Mr. Ardalan emailed Mr. Ardekani stating Quidel was reviewing the proposals and hoped to get back to him by June 25, 2021), JA821 (Mr. Ardekani emailed Mr. Ardalan asking for a call on July 6, 2021).

9

outside of the initial quality approval process. ECF No. 48-6 at JA837, A. Ardekani Dep. Tr. 32:8-23. Azer filed a Complaint against Quidel on July 2, 2022. Pl.'s Compl., ECF No. 1.

## II. LEGAL STANDARD

Summary judgment is properly granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Facts are material if they "might affect the outcome of the suit under the governing law." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute as to those facts is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (quoting *Anderson*, 477 U.S. at 248). "We view all the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Id.* (internal quotation marks and citation omitted).

The party moving for summary judgment must first "identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In response, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Anderson*, 477 U.S. at 252).

These summary judgment rules apply where there are cross-motions for summary judgment. *Lawrence v. City of Phila., Pa.*, 527 F.3d 299, 310 (3d Cir. 2008). As the U.S. Court of Appeals for the Third Circuit provided,

> [c]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination where genuine issues of material fact exist. If any such issue exists it must be disposed of by a plenary trial and not on summary judgment.

*Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968) (citing *F.A.R. Liquidating Corp. v. Brownell*, 209 F.2d 375, 380 (3d Cir. 1954)). So "[c]ourts treat cross-motions for summary judgment as if they were distinct, independent motions, and must rule on each party's motion on an individual and separate basis." *Richman & Richman Real Est., LLC v. Sentinel Ins. Co., Ltd.*, No. 2:16-CV-1855, 2017 WL 4475963, at *2 (E.D. Pa. June 13, 2017) (citing *Beneficial Mut. Sav. Bank v. Stewart Title Guar. Co.*, 36 F.Supp.3d 537, 544 (E.D. Pa. 2014)).

### III. DISCUSSION

Quidel moves for partial summary judgment concerning Azer's claims of: (1) breach of contract; (2) anticipatory breach of contract; (3) unjust enrichment; and (4) declaratory judgment. Quidel contends the Parties' March 25, 2021 emails are not a binding contract and thus Azer's claims cannot go forward. Azer moves for partial summary judgment on the first two elements of its breach of contract claim: that the Parties entered into a binding agreement and Quidel breached that agreement. Relatedly, Azer also moves for summary judgment on its declaratory judgment claim. The Court addresses these arguments in seriatim.

### a. Quidel's Partial Motion for Summary Judgment

### i. Breach of Contract Claim

Quidel contends no contract exists between the Parties because neither Party manifested an intent to be bound by the March 25, 2021 emails and the alleged terms of the contract are not sufficiently definite. Azer submits both Parties manifested an intent to be bound by the March 25, 2021 emails and the emails contain sufficiently definite terms. The Parties agree on the underlying facts but not whether the facts support the existence of an enforceable contract formed on March 25, 2021.[11]

"The [c]ourt must determine whether a reasonable jury, considering the parties' undisputed actions and words, could find that they formed a binding oral contract. That inquiry may be resolved at the summary judgment stage.". *Ecore Int'l, Inc. v. Downey*, 343 F. Supp. 3d 459, 488 (E.D. Pa. 2018) (citing *Bennett v. Itochu Int'l, Inc.*, No. 09-CV-1819, 2012 WL 3627404, at *15 (E.D. Pa. Aug. 23, 2012), *aff'd*, 572 F. App'x 80 (3d Cir. 2014)). "'Under Pennsylvania law where the facts are in dispute, the question of whether a contract was formed is for the jury to decide.'" *Okna Windows v. Diversified Structural Composites*, No. CV 18-2444, 2019 WL 3777632, at *4 (E.D. Pa. Aug. 12, 2019) (citing *Ecore*, 343 F.Supp. 3d at 487)). "'However, [t]he question of whether an undisputed set of facts establishes a contract is a matter of law.'" *Id.* Here, the Parties do not dispute the relevant facts; they argue whether those facts give rise to an enforceable contract.

"Pennsylvania law requires that a plaintiff seeking to proceed with a breach of contract action must establish '(1) the existence of a contract, including its essential terms, (2) a breach of duty imposed by the contract[,] and (3) resultant damages.'" *Ware v. Rodale Press, Inc.*, 322 F.3d

---

[11] The Parties do not dispute Pennsylvania law governs this issue. *See* ECF No. 17 (Def MPSJ) & ECF No. 48 (Pl MPSJ).

218, 225 (3d Cir. 2003) (citing *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)). Firstly, "[t]he elements of an enforceable contract under Pennsylvania law are: (1) a manifestation of an intent to be bound by the terms of the agreement, (2) sufficiently definite terms, and (3) an agreement supported by adequate consideration." *Legendary Art, LLC v. Godard*, 888 F. Supp. 2d 577, 585 (E.D. Pa. 2012) (citing *Szymanski v. Sacchetta*, 2012 WL 246249, at *4 (E.D. Pa. Jan. 26, 2012)).

The Parties first dispute whether they intended to enter into a contract.[12] Quidel contends neither party intended to be bound by the March 25, 2021 emails. Quidel argues the record shows both Parties continued to negotiate the agreement, the Parties' conduct is not consistent with a binding agreement, and the terms in the March 25, 2021 emails are not sufficiently defined. *See generally* ECF No. 47-1. On the other hand, Azer submits the terms of the agreement and the Parties' conduct shows both parties manifested their intent to be bound. *See generally* ECF No. 53. "In assessing intent, the object of inquiry is not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 582 (3d Cir.2009) (citing *Ingrassia Constr. Co., Inc. v. Walsh*, 486 A.2d 478, 483 (Pa. Super. Ct. 1984). "Accordingly, a true and actual meeting of the minds is not necessary to form a contract." *Id.*

"The strongest objective manifestation of intent is the language of the contract." *Okna*, 2019 WL 3777632, at *4 (citing *Teva Pharm. Indus., Ltd. v. United Healthcare Servs., Inc.*, Civ. A. No. 16-4870, 2018 WL 1898911, at *6 (E.D. Pa. Apr. 20, 2018)). "Pennsylvania contract law begins with the 'firmly settled principle that 'the intent of the parties to a written contract is

---

[12] The Court notes the Parties do not dispute that adequate consideration supported the March 25, 2021 agreement.

contained in the writing itself.'" *Id.* (citing *Norfolk S. Ry. Co. v. Pittsburgh & W. Virginia R.R.*, 870 F.3d 244, 253 (3d Cir. 2017)).  In this case, the Parties use clear language in the alleged contract at issue.  After weeks of correspondence on the twelve-month project, Mr. Ardekani e-mailed Ms. Bader and Mr. Ardalan asking for confirmation in writing that "[Azer] [is] approved to order the equipment and that we have your commitment."[13]  The same day, Ms. Bader replied, "Please use this note as confirmation that we will be moving forward with the 2.5M/week (10M/month) commitment and to support Azer's order of equipment.  We are working on the [Product Order] now."  ECF No. 48-4 at JA181-82.

Quidel argues the Parties' exchange over email precludes the agreement from being an enforceable contract.  But "an exchange of e-mails . . . between parties[] may be sufficient to establish a contract." *Ecore*, 343 F. Supp. 3d at 488 (citing *Reynolds Packaging KAMA, Inc. v. Inline Plastics Corp.*, No. 08-1902, 2011 WL 5089500, at *8 (M.D. Pa. Oct. 25, 2011)).  And both Ms. Bader and Mr. Ardekani expressly acknowledge they are making a "commitment" on a set duration of time, a particular product and service, and a defined quantity.  Furthermore, neither individual states the "commitment" is conditional on other conditions being met.[14]

---

[13] ECF No. 48-4 at JA176-77, JA181-82.  Mr. Ardekani's email attached a proposal detailing the agreement's materials and services, price calculation, and duration.  *See id.* at JA176-77.

[14] *See Okna*, 2019 WL 3777632, at *4 (""When parties express that a writing is not binding unless certain conditions are met, courts honor their intent not to be bound unless those conditions are met.") (internal citations omitted).  Quidel argues the March 25, 2021 email exchange is not an enforceable contract because, among other reasons, the agreement required (1) appropriate corporate approval, (2) an issued purchase order, and (3) and additional terms and conditions memorialized and confirmed in a Supply Agreement.  *See generally* ECF No. 47-1.  But the language used by Quidel's employee and point-of-contact in the agreement, Ms. Bader, is clear and without conditions.  And courts are to analyze the written language of a contract when in writing.  *See Okna*, 2019 WL 3777632, at *4 (citing *Norfolk*, 870 F.3d at 253); *compare Legendary Art, LLC v. Godard*, 888 F. Supp. 2d 577, 585 (E.D. Pa. 2012) ("In the case of *oral* contracts, "'courts must look to surrounding circumstances and course of dealing between the parties in order

Quidel argues the emails do not amount to an enforceable contract because they are merely the Parties' ongoing negotiations at the time. "Pennsylvania courts agree that '[a]n agreement to agree is incapable of enforcement.'" *Reynolds*, 2011 WL 5089500 at *8. "Thus the mere statement of an aspirational goal to reach some future agreement is not an enforceable contract in Pennsylvania." *Id.* But here, both individuals express their "commitment" in the present tense, which does not suggest any aspirational or forward-looking intent like in an unenforceable agreement-to-agree. And continued negotiations and efforts to draft subsequent formal documents do not prevent the existence of an enforceable contract. *See Am. Eagle*, 584 F.3d at 582 ("[P]arties may bind themselves contractually although they intend, at some later date, to draft a more formal document."). So the email exchange may still amount to an enforceable contract although the Parties continued to finalize certain terms and conditions in the form of a purchase order and supply agreement.

Next, the emails sufficiently sketch out the material terms of the Parties' agreement. "[T]ime or manner of performance, and price or consideration are essential terms of an alleged bargain, and must be supplied with sufficient definiteness for a contract to be enforceable." *Great N. Ins. Co. v. ADT Sec. Servs., Inc.*, 517 F. Supp. 2d 723, 736 (W.D. Pa. 2007) (citing *Lackner v. Glosser*, 892 A.2d 21, 31 (Pa. Super. Ct. 2006)); *compare Lombardo v. Gasparini Excavating Co.*, 123 A.2d 663, 666 (Pa. 1956) (finding that an alleged contract failed for indefiniteness where

---

to ascertain their intent.'") (emphasis added) (citations omitted). Even if the Court were to look to surrounding circumstances to determine the Parties' intent in this case, the Parties acted consistently with their agreement on the terms of the March 25, 2021 email exchange. The Parties continued to negotiate around the core terms expressed in the March 25, 2021 email exchange. *See e.g.*, ECF No. 48-4 at JA188, JA197, JA220, JA249. And Quidel never expressed the need for a product order or supply agreement—or additional approval from higher-ups— to be finalized before making the twelve-month "commitment" for the price, subject matter, and quantity described in the emails.

"there was no agreement or even discussion as to any of the essential terms of the alleged bargain such as time or manner of performance, price to be paid, or the like")). The emails provide Azer would supply Quidel with 2.5 million tubes per week (or ten million tubes per month) for a twelve-month period.[15] So the Parties agreed in writing to the projects' essential terms, including price, product, quantity, and time-commitment. *See Quandry*, 2009 WL 997041, at *12 ("The essential terms of a contract . . . include the time and manner of performance and price or other consideration." (citations omitted)). The Parties continued to negotiate additional terms and draft formal documents governing the project. But, where as here, ". . . the parties have agreed on the essential terms, the contract is enforcible[*sic*] even though it is an informal memorandum requiring future approval or negotiation of incidental terms." *Yellow Run Coal Co. v. Alma-Elly-Yv Mines, Ltd.*, 426 A.2d 1152, 1154 (Pa. Sup. Ct. 1981) (citing *In re ABC-Federal Oil & Burner Co.*, 290 F.2d 886 (3rd Cir. 1961); *Field v. Golden Triangle Broad., Inc.*, 305 A.2d 689, 693 (Pa. 1973)).

The Parties' March 25, 2021 email exchange amounts to a valid contract because the Parties intended to be bound to a commitment containing clear and sufficiently definite essential terms. Quidel's Motion for Summary Judgment relies on its argument that the Parties' March 25, 2021 email exchange does not amount to a valid contract. Because the Court finds the Parties entered an enforceable contract on March 25, 2021, the Court will deny in part Quidel's Motion

---

[15] On March 25, 2021, after entering the alleged contract at issues, the Parties clarified the apparently contradictory terms of the agreement. *See* ECF No. 48-4 at JA181 (Ms. Bader's email to Mr. Ardekani confirming a quantity of "2.5M/week (10M/month)[,]" totaling 130,000,000 and 120,000,000 tubes over fifty-two weeks, respectively). Soon after the agreement, the Parties agreed Azer would provide a quantity of ten million tubes a month for twelve months, or 120,000,000 tubes. *Id.* at JA179-80.

for Summary Judgment concerning Azer's breach of contract, anticipatory breach, and declaratory judgment.[16]

### ii. Unjust Enrichment Claim

Quidel also moves for summary judgment concerning Azer's unjust enrichment claim. "[T]he Pennsylvania Supreme Court has left no doubt that 'unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract." *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 228 (3d Cir. 2022) (citing *Wilson Area Sch. Dist. v. Skepton*, 895 A.2d 1250, 1254 (Pa. 2006)). Because the Court finds the Parties formed a written contract on March 25th, Azer cannot maintain an unjust enrichment claim—a quasi-contract remedy. Accordingly, summary judgment is appropriate concerning Azer's unjust enrichment claim.

### b. Azer's Partial Motion for Summary Judgment
### i. Breach of Contract Claim and Request for Declaratory Relief

Azer moves for summary judgment on the first two elements of its breach of contract claim and related request for declaratory relief. For the foregoing reasons, the Court finds the Parties entered a binding agreement as per the March 25, 2021 emails. Accordingly, summary judgment is appropriate concerning the first element of Azer's breach of contract claim: whether the Parties entered into a binding contract. The Court now considers whether summary judgment is

---

[16] Quidel's Partial Motion for Summary Judgment almost exclusively relies on its argument the Parties did not enter into a contract on March 25, 2021, and thus Azer cannot meet its burden of proving the elements of its breach of contract, anticipatory breach, and declaratory judgment claims. *See generally* ECF No. 47-1; Def.'s Reply in Supp. of Def.'s Mot. for Partial Summ. J., ECF No. 56. Quidel does not make arguments concerning the other elements of these claims. *See id.* Accordingly, the Court will address the breach of contract arguments raised in Azer's Partial Motion for Summary Judgment.

17

appropriate concerning Azer's claims Quidel breached the contract and, relatedly, whether the Court may enter declaratory judgment concerning Quidel's breach.[17]

As stated, a plaintiff asserting a breach of contract claim under Pennsylvania law must establish three elements, including "a breach of a duty imposed by the contract." *Zeno v. Ford Motor Co.*, 480 F. Supp. 2d 825, 834 (W.D. Pa. 2007) (citing *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003)). "In general, when a party fails to satisfy an express contractual obligation, the lack of performance is a breach of the provision creating that obligation." *Rosser Int'l, Inc. v. Walter P. Moore & Assocs., Inc.*, No. 2:11-CV-1028, 2013 WL 3989437, at *15 (W.D. Pa. Aug. 2, 2013) (citing *John B. Conomos, Inc. v. Sun Co., Inc. (R&M)*, 831 A.2d 696, 707-08 (Pa. Super. Ct.)). And "[t]o constitute anticipatory breach under Pennsylvania law there must be 'an absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so.'" *Edwards v. Wyatt*, 335 F.3d 261, 272 (3d Cir. 2003) (citing *2401 Pennsylvania Ave. Corp. v. Federation of Jewish Agencies*, 489 A.2d 733, 737 (Pa. 1985)).

Here, the Parties dispute whether Quidel breached the March 25, 2021 contract. Azer contends Quidel expressly communicated to Azer it would not follow through on its twelve-month commitment. But Quidel argues no facts in the record show Quidel communicated it would not meet its commitment. The Court agrees. Although Quidel provided internal emails suggesting a need "to communicate [a] ramp down[,]" no facts in the record show Quidel explicitly conveyed to Azer it no longer intended to fulfill the twelve-month agreement. ECF No. 48-5 at JA360. And

---

[17] Azer moves for declaratory relief related to its breach of contract claim. Azer asks the Court to enter declaratory judgment concerning Quidel's breach of the March 25, 2021 contract and corresponding damages. *See* ECF No. 1 at 11-12. Because Azer's request for declaratory relief is integrally intertwined with its Motion for Summary Judgment on the second element of its breach of contract claim, the Court addresses these requests simultaneously.

Quidel disputes Azer's claim that Quidel communicated it would not purchase the quantity of tubes agreed upon.[18] In fact, Quidel contends Azer breached the contract because (1) Azer never filled or delivered a tube under the agreement besides the quality assurance tests, ECF No. 48-6 at JA837, A. Ardekani Dep. Tr. 32:8-23, and (2) Azer filed this lawsuit while the Parties continued to negotiate this matter, *see id.* at JA817 (Mr. Ardalan's email Quidel was reviewing Azer's proposals and would respond by June 25, 2021), JA821 (Mr. Ardekani's email asking for a call with Mr. Ardalan on July 6, 2021); *see also* Pl. Compl., ECF No. 1 (filed by Azer on July 2, 2021). The factual disputes concerning both Parties' failures to perform under the contract prevent summary judgment on these claims.

## IV.    CONCLUSION

The Court finds the Parties' email correspondence on March 25, 2021 amounts to a binding contract. Accordingly, summary judgment is not warranted in Quidel's favor concerning Azer's claims of breach of contract, anticipatory breach of contract, and declaratory judgment. Summary judgment is warranted in favor of Quidel as to Azer's unjust enrichment claim because the Parties formed a written, express contract.

Relatedly, the Court finds summary judgment in Azer's favor is appropriate concerning the first element of Azer's breach of contract claim. But factual disputes surrounding breach of the

---

[18] *See* ECF No. 51-1 at 35. In its Statement of Undisputed Material Facts, Azer provided: "Ardalan and Azer had a phone call on June 21, [2021] during which Ardalan advised that Quidel would not purchase the 120 million tubes within the 12 month commitment period." ECF No. 48-2 ¶96 (citing ECF No. 48-6 at JA1157, H. Ardalan Dep. Tr. 201:12-22). Quidel responded that the statement was "[d]isputed." ECF No. 51-1 at 35. Quidel further provided the cited testimony showed ". . .Mr. Ardalan stated 'it is likely that [he and Mr. Ardekani] talked,' he did not 'recall the exact time and date of the conversation.'" *Id.* (citing ECF No. 48-6 at JA1157, H. Ardalan Dep. Tr. 201:12-22).

contract preclude summary judgment as to the second element of Azer's breach of contract claim and the corresponding request for declaratory relief.

    An appropriate order follows.

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge