IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AZER SCIENTIFIC INCORPORATED, <br> Plaintiff, | : <br> : <br> : | |
| v. | : <br> : | Civil No. 5:21-cv-02972-JMG |
| QUIDEL CORPORATION, <br> Defendant. | : <br> : <br> : | |

## MEMORANDUM OPINION

**GALLAGHER, J.**                                                                 January 27, 2023

    Plaintiff Azer Scientific Incorporated alleges Defendant Quidel Corporation breached a contractual agreement the Parties formed over email. On December 5, 2022, this Court found the Parties' email correspondence on March 25, 2021 amounts to a binding contract. *See generally* Mem. Op., ECF No. 66 (granting partial summary judgment). On March 25, 2021, the Parties agreed Defendant Quidel would pay Plaintiff Azer to fill, cap, and manufacture reagent for 120 million two mL tubes over a period of twelve months at a price of $0.087975 per tube, for a total contract price of $10,557,000.00. Mem. Op., ECF No. 103 at 12 (outlining the Court's understanding of the contract's pricing). Azer now moves in limine for a ruling the Pennsylvania Uniform Commercial Code, Article 2, 13 Pa.C.S. § 2101 *et seq.* (U.C.C.) applies to the Parties' March 25, 2021 contract. *See generally* Pl.'s Mot. in Lim., ECF No. 76 at 3. Quidel opposes Azer's motion in limine. Quidel avers the U.C.C. does not apply to the Parties' contract because the Parties' contemplated a services contract based on Azer's automated tube-filling services. Def.'s Resp. in Opp'n, ECF No. 86 at 3. The Court agrees the Parties' contract is predominantly

1

for the performance of services. For the following reasons, Azer's Motion in Limine for a Ruling the U.C.C Applies to the the Parties' Contract will be denied.

I.     FACTUAL BACKGROUND

Azer provides manual and automated tube-filling services, and manufactures and supplies products for laboratories. Pl.'s Am. Compl., ECF No. 10 ¶2. Quidel develops and manufactures medical devices. *Id.* On March 2, 2021, Azer approached Quidel to see if Quidel needed "any other products." Joint Appendix, ECF No. 48-4 at JA131. Azer pointed out its capacity to fill products because of "[its] cleanroom with automation that [it] uses[s] to fill special liquids/media." *Id.* Quidel responded it "ha[d] a need for filling." *Id.* Quidel then asked about Azer's "available filling capacity now." *Id.* On March 4, 2021, Azer informed Quidel it could procure machines "to enable [Azer] to fill and cap over one (1) million 2mL tubes per week." *Id.* at JA107.

On March 15, 2021, Azer provided Quidel with a pricing proposal based on the length of commitment; the pricing proposal listed, inter alia, the "[v]olume" of tubes per week, and the "[p]rice per fill." *Id.* at JA118. On March 16, 2021, Quidel asked Azer to provide a new quote also including the price for Azer to manufacture the reagent solution to fill the tubes. *Id.* at JA101. Azer provided a quote with a price of $0.0808 per tube for filling services, and $0.007175 per tube to manufacture the reagent formulation. *Id.* at JA172. The Parties clarified Quidel would provide the tubes and caps to Azer, who would use equipment designed to work with the size of Quidel's tubes and caps. Pl.'s Concise Statement of Undisputed Material Facts, ECF No. 48-2 ¶43 (quoting Joint Appendix, ECF No. 48-6 at JA945-46 (K. Bader Dep. Tr. 75:24 -76:18)).

On March 25, 2021, the Parties contracted for Azer to supply 120 million filled tubes over a period of twelve months. ECF No. 48-4 at JA181. At a rate of $0.087975 per tube, as agreed to

by the Parties, the total contract price would equal $10,557,000.000—or, in other terms, $9,696,000.000 for the filling services and $861,000.000 for the reagent formulation. *See* ECF No. 103 at 12 (outlining the Court's understanding of the contract's pricing); *see also* ECF No. 48-4 at JA172. The Parties continued to negotiate and draft additional forms to govern the agreement, in the form of a "Purchase Order" and a "Supply Agreement." *See e.g.*, ECF No. 48-4 at JA187, JA197. But these forms were never executed.[1]

Azer filed a lawsuit on July 2, 2021 alleging Quidel breached the Parties' March 25, 2021 contract, among other claims. *See generally*, Pl.'s Compl., ECF No. 1. On December 5, 2022, the Court resolved the Parties' cross-motions for partial summary judgment. *See generally*, ECF No. 66; ECF No. 67. The Parties' trial date is quickly approaching. In preparation of trial, Azer filed a Motion in Limine for a Ruling the Pennsylvania U.C.C. governs the Parties' March 25, 2021 because, it contends, the contract concerns goods—here, 120 million filled 2mL tubes. *See generally* ECF No. 80. Quidel opposes Azer's motion. Quidel avers the U.C.C. does not apply to the Parties' contract because the Parties' contemplated a services contract based on Azer's automated tube-filling services. ECF No. 86 at 3.

## II.     LEGAL STANDARD

"By its terms, Article 2 of the U.C.C. only applies to contracts for the sale of goods." *Power Restoration Int'l, Inc. v. PepsiCo, Inc.*, No. CIV.A. 12-1922, 2015 WL 1208128, at *10 (E.D. Pa. Mar. 17, 2015). And "'[g]oods' are defined as 'all things (including specially

---

[1] The Parties agree a Supply Agreement—the governing document concerning their relationship and agreement—was never executed. Joint 26(f) Report, ECF No. 20 at 6; *see also* ECF No. 48-4 at JA197. And Azer rejected Quidel's draft Purchase Order. *See* ECF No. 48-2 ¶57; *see also* ECF No. 48-4 at JA197.

3

manufactured goods) which are movable.'" *Id.* at *9 (internal citation omitted). Pennsylvania courts often "treat the question of whether goods or services predominate in a mixed goods and services contract as a . . . as a matter of law." *Id.* (citing *Cover v. Corle*, 610 A.2d 1036 (Pa. Super. Ct. 1992)).

First, courts in Pennsylvania should "determine whether there is a 'significant service component'" to the agreement. *Id.* at *10 (internal citation omitted). If there is no significant service component, the U.C.C. applies because the contract concerns the sale of goods. *See id.* "If there is a significant service component, then the second step of the analysis is to conduct the predominant factor test." *Id.* (internal citation omitted).

"In the Third Circuit, courts determine the applicability of the UCC to a mixed contract for goods and service 'by examining the predominance of goods or services . . . .'" *Id.* (quoting *Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670, 676 (3d Cir. 1991) (applying Pennsylvania law)). So courts should "consider the purpose or essence of the contract." *Advent Sys. Ltd.* 925 F.2d at 676. In doing so, "[c]ourts consider the totality of the circumstances, and their analyses . . . [include] (1) the relative costs of the materials supplied with the costs of the labor; (2) the compensation structure of the agreement; (3) the language and circumstances surrounding the contract; and (4) the interrelationship of the goods and services to be provided (i.e., whether one is incidental to the other[*sic*]." *Power Restoration*, 2015 WL 1208128, at *10 (citing *Advent Sys. Ltd.* 925 F.2d at 676; *KSM Assocs., Inc. v. ACS State Healthcare, LLC*, No. 05–4118, 2006 WL 847786 (E.D. Pa. Mar. 30, 2006)).

4

### III.     DISCUSSION

Here, the Parties' contract includes a "significant service component" in Azer's service of filling and capping tubes and caps provided by Quidel. *See Crestwood Membranes, Inc. v. Constant Servs., Inc.*, No. 3:15-CV-537, 2017 WL 1088089, at *7 (M.D. Pa. Mar. 22, 2017) (finding a printing company provided services—not goods—where the company printed ink on materials provided to it, and then returned the printed-on materials to the customer); *see also IMI Norgren Inc. v. D&D Tooling & Mfg., Inc.*, No. 00 C 5789, 2003 WL 21501783, at *3 (N.D. Ill. June 25, 2003) (" . . . [T]he change in physical custody of the goods was only incidental to the transaction; therefore the parties' agreement was a contract for the performance of service, and not for the sale of goods.") (citing *Manes Org., Inc. v. Standard Dyeing & Finishing Co.*, 472 F. Supp. 687, 690 (S.D.N.Y. 1979)). Nevertheless, Azer properly distinguishes the present action from the service provided in *Crestwood Membranes, Inc. v. Constant Servs., Inc.*, because, here, Azer <u>also manufactures</u> the reagent solution to fill the tubes. *Cf.* 2017 WL 1088089, at *7 (noting the printing company "does not manufacture any [contracted-to materials]"). The Parties' inclusion of both services (Azer's tube-filling services) and goods (the manufactured reagent solution) in the contract shows this is a "mixed goods and services arrangement." *Advent Sys. Ltd.*, 925 F.2d at 676. So the Court looks to whether the goods or the services component predominates. *See id.*; *Power Restoration Int'l, Inc.*, 2015 WL 1208128, at *10.

Azer's tube-filling services predominate the contract at issue because Quidel initiated the business relationship concerning Azer's "filling capacity," the cost of the filling services greatly overshadows the cost of manufacturing the solution, and thus the totality of the circumstances shows the manufactured solution—as compared to the services provided—is incidental to the agreement. First, the language and circumstances surrounding the contract and the

5

interrelationship between the goods and services weigh in favor of the services predominating. Quidel initially inquired about Azer's "filling capacity" to fill Quidel's tubes and caps for its COVID-19 tests. ECF No. 48-4 at JA131. Employees for both Parties initially discussed the Azer's filling capacity—including the need to buy specialized machines to meet Quidel's specifications—and related pricing. The Parties later agreed Azer would also manufacture the reagent solution used in the filling process and decided on a suitable price. Quidel's initial interest in Azer's filling capacity shows its services—not the manufactured products—are at the root of the Parties' business relationship and resulting contract. Furthermore, the value of Azer's manufactured solution would likely diminish if Azer could not also fill the provided tubes with the solution, cap the finished product, and ship them off to Quidel. *Cf. Bruel & Kjaer v. Vill. of Bensenville*, 969 N.E.2d 445, 451 (Ill. App. Ct. 2021) ("In the absence of the widgets themselves, the services to make them operable would be meaningless and without value.").

Looking to the terms of the contract, Azer avers the Parties' use of the term "units" and negotiation of a Purchase Order and Supply Agreement show the Parties contemplated a contract concerning goods. Azer correctly identifies that the March 25, 2021 contract formed over email "describe[s] the transaction as an order for a certain quantity of "units" (tubes) per month at the agreed-upon price per tube." ECF No. 76 at 7. But as Quidel persuasively contends, the Parties also quantified the services by the number of "fills" provided. *See* ECF No. 48-4 at JA118 (pricing proposal showing the "[v]olume" of tubes per week, and the "[p]rice per fill"); *id.* at JA174 ("send updated quote to reflect volume of 10M fills/month for 1 year (120M fills total"); *id.* at JA180 ("the unit of measure is case of 5,000 fills"). So the Parties did not exclusively quantify the contract by the number of tubes or "units." And, here, the contract is in the form of a series of emails using various terms for the quantity. The contract is not in the form of a Purchase Order or

Supply Agreement with verbiage signifying the goods predominate.[2] The email contract arose from Quidel's interest in Azer's filling capacity and the amount of fills they could provide over a certain period of time. Thus the language and circumstances surrounding the contract weighs in favor of the services component predominating.

Furthermore, the relative cost of the manufactured materials is greatly outweighed by the cost of services. Here, Azer's initial price proposal only including filling services. Following further negotiation and the inclusion of the manufactured goods, the contract total amounted to $9,696,000.000 for the filling services and $861,000.000 for the manufacturing of the reagent solution. *See* ECF No. 103 at 12; *see also* ECF No. 48-4 at JA172. In other terms, Azer's services account for a little less than ninety-two (92) percent of the total contract price, as compared to the goods portion amounting to just under nine (9) percent. The price disparity between the services and goods components of the contract thus weighs in favor of the services predominating. *Cf. Power Restoration Int'l, Inc.*, 2015 WL 1208128, at *11 (finding a price disparity weighed in favor of a contract predominantly for goods where the prices for the service deliverable did not exceed ten (10) percent of the total prices offered); *United States v. Colville*, No. 2:97CV330-C, 1998 WL 1818928, at *6 (W.D.N.C. June 23, 1998) (finding the sale of heaters as the dominant factor where the goods accounted for eighty-eight percent of the invoice and the services "were directly related to the very utility of the goods"); *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737,

---

[2] *Cf. BMC Indus., Inc. v. Barth Indus., Inc.*, 160 F.3d 1322, 1331 (11th Cir. 1998) (finding a contract titled "purchase order" and references to "buyer" and "seller" indicated a contract for goods); *Meeker v. Hamilton Grain Elevator Co.*, 442 N.E.2d 921, 923 (Ill.App.Ct.1982) (stating that a contract that calls the parties "seller" and "purchaser" indicates a contract for goods). Here, the Parties continued to negotiate and draft additional terms in the form of a Purchase Order and Supply Agreement, but the Parties do not dispute the governing Supply Agreement was never executed nor that Azer rejected the Purchase Order. *See supra* n. 1. Email correspondence is the basis for the contract in the present action.

743 (2d Cir. 1979) (finding the essence of a contract was for sale of goods because the compensation billed only for the goods, not for the services provided).

In sum, the Court finds the Parties' contract contains a significant service component in Azer's tube-filling services. The Parties initiated their arrangement due to Azer's services capacity. Although the Parties later decided to incorporate a goods component in the form of Azer's manufactured solution used to fill the tubes, the totality of the circumstances, including the contract's cost breakdown and the Parties' continued communication on the services aspect of the contract, lead the Court to find the services component predominates the Parties' arrangement.

### IV.     CONCLUSION

The Court finds the Parties' contract is predominantly for the performance of services. Accordingly, Azer's Motion in Limine for a Ruling the U.C.C Governs the Parties' March 25, 2021 is denied.

An appropriate Order follows.

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge